UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
AXA CORPORATE SOLUTIONS
INSURANCE COMPANY f/k/a
AXA GLOBAL RISKS, U.S. INSURANCE
COMPANY, and FIRST INDEMNITY OF
AMERICA INSURANCE COMPANY,

                                        03 Civ. 8493 (DAB)
            Plaintiffs,                  MEMORANDUM & ORDER

        -against-

LUMBERMENS MUTUAL CASUALTY CO.,

            Defendant.
------------------------------------X
DEBORAH A. BATTS, United States District Judge.

        Plaintiffs AXA Corporate Solutions Insurance Company ("AXA")

and First Indemnity of America Insurance Company ("FIA") have

filed a Second Amended Complaint against Defendant Lumbermens

Mutual Casualty Co. ("Lumbermens") for breach of implied

indemnity, reformation of contract and breach of contract on each

of two Co-Surety Agreements.

        For the reasons that follow, Defendant Lumbermens' Motion to

Dismiss is GRANTED.


                        I.  BACKGROUND

A.  Factual Background

        Although much of the factual background underlying this

dispute has been recited in the Court's prior decision on

Defendant's  Motion to Dismiss, <u>see</u> <u>AXA Corporate Solutions Ins.</u>

<u>Co. v. Lumbermens Mut. Cas. Co.</u>, No. 03 Civ. 8493, 2005 WL
1649045 (S.D.N.Y. July 13, 2005), the addition of FIA as
Plaintiff and new factual allegations necessitate a thorough
recitation of facts.

Plaintiff AXA is licensed to conduct business as an insurer
and surety in the State of New York, with its place of business
in New York, New York.  Plaintiff FIA is a foreign corporation
with a place of business in Parsippany, New Jersey.  Defendant
Lumbermens is authorized to conduct the business of insurance in
the State of New York, with its principal place of business in
Long Grove, Illinois.

### 1.  The Relationship Between AXA and FIA

Plaintiffs contend that at all times relevant to the events
in the Second Amended Complaint, FIA was the agent of AXA with
respect to the underwriting and administration of a surety bond
program, pursuant to a written agreement dated on or about July
1, 1991.  (2d Am. Compl. ¶ 7.)  The signatories to this agreement
(hereinafter the "Underwriting Agreement") were Colonia Insurance
Company, the predecessor company of AXA, FIA and/or FIA Financial
Services Group.[1]

---

[1] FIA and FIA Financial Services Group are referred to as on
entity, FIA/FSG, throughout the Underwriting Agreement.

The Underwriting Agreement states that "Colonia is desirous of FIA/FSG assuming the functions that are normally performed by the company to place and service a program of surety bonds" and "FIA is desirous of reinsuring the bonds issues by [Colonia] on a quota share treaty basis."  (Dreifuss Aff. at Ex. C, pp.1-2.) According to the Underwriting Agreement, FIA/FSG agreed to provide certain administrative services with respect to the administration and servicing of the Bonds, including: (1) receiving, reviewing and advising Colonia of all notices or claims and of any proposed adjustments relating to bonds; (2) approving or rejecting bonds on behalf of Colonia in accordance with guidelines provided by FIA; (3) assisting and advising Colonia with the preparation of bond forms, applications, and other printed documents related to the sale and administration of the bonds; (4) maintaining and furnishing Colonia with records relating to the underwriting insurance and maintenance of the bonds, and any losses or claims related to them, as requested by Colonia; (5) receiving and maintaining any collateral received in connection with the bonds; (6) preparing written reports and statistical information relating to the bonds for Colonia; and (7) collecting premiums on behalf of Colonia and forwarding them to it.  (Id. at Ex. C ¶ 1.)

The Underwriting Agreement also contained a paragraph

entitled "Independent Contractor" which stated that "Nothing in this Agreement creates the relationship of an employer or employee, joint venture, partnership or association between [Colonia], FIA/FSG and FIA. In no event may FIA/FSG and/or FIA bind [Colonia] to any agreement, contract or alter, modify, vary or waive the terms of any such agreement or contract." (Id. ¶ 15.)

In addition to the Underwriting Agreement, FIA and AXA entered into a Surety Quota Share-Reinsurance Treaty on or about February 1, 1992.[2] The scope of the Treaty included, but was not limited to, surety bonds issued in the name of AXA. (2d Am. Compl. ¶ 9.)

Pursuant to the execution of the Underwriting Agreement and to facilitate the issuance of AXA's bonds, AXA appointed several FIA employees as attorneys-in-fact to sign bonds issued, namely Patrick J. Lynch, Michael J. Tully, Eamonn T. Long and Philip S. Toby. (Id. ¶ 8.)

Plaintiffs contend that "[i]n furtherance of its agency authority" under the Underwriting Agreement, FIA dealt with other insurance/surety companies, who also wrote bonds in New York state or engaged in reinsurance, including Defendant Lumbermens.

---

[2] A copy of the Treaty was not provided to the Court.

**4**

(Id. ¶ 10.)

On a "one by one basis," FIA "as agent for AXA" entered into "co-surety agreements" with Lumbermens, through Lumbermens' agent Universal Bonding Insurance Company ("Universal Bonding"). (Id. ¶ 11.) Plaintiffs believe that Universal Bonding was owned by Defendant, which in turn, was owned by Kemper Insurance Company. (Id. ¶ 12.) According to Plaintiffs, Defendant, through its agent Universal Bonding, and AXA, through its agent FIA, entered into dozens of co-surety agreements with respect to the underwriting and issuance of performance and payment bonds. Such co-surety agreements were executed in the name of AXA and were based on an apportionment of liability with respect to the penal sum of each performance or payment bond issued. (Id. ¶ 13.) All premiums received were appropriately apportioned by and between the parties, in their proportionate amount, as were losses incurred in connection with those bonds. (Id. ¶ 14.) "Excepting the co-surety agreements at issue in this matter," Plaintiffs believe that all premium and/or losses under co-surety agreements between FIA, on behalf of AXA, and Universal Bonding, on behalf of Lumbermens have been paid. (Id. ¶ 15.) Universal Bonding, located in Lyndhurst, New Jersey sent written communications and invoices to AXA at FIA's address in Parsippany, New Jersey. (Id. ¶ 15, and Ex. F.)

5

## 2. Valenzuela Bonds

On or about April 27, 1999, AXA, as surety, and non-party Valenzuela Engineering, Inc., executed a Performance Bond and a Payment Bond in favor of the United States of America, as obligee, in connection with certain construction work known as N/B Renovate Aircraft Maintenance Facility, Edwards AFB, CA, Contract No. DACA05-99-C-0032 ("Valenzuela Project"). Each bond was "in the penal sum" of $6,978,000 and together were known as Bond No. L04576 ("the Valenzuela Bonds"). (Id. ¶¶ 19-20.) The AXA representative listed on the Valenzuela Bonds is Eamonn T. Long as Attorney-in-Fact.

On May 9, 1999, Plaintiffs allege that AXA, by and through its agent FIA, and by FIA's employee Eamonn T. Long, and Lumbermens entered into a written agreement, designated as Co-Surety #142.[3] (Id. ¶ 23.) According to Plaintiffs, Co-Surety #142 was prepared by Kemper Insurance Company, owner of Defendant, on Kemper letterhead, and forwarded to FIA, as agent for AXA, "as was the customary procedure employed between the parties." (Id. ¶ 24.) And "[a]s was the course of dealings between the parties," Co-Surety #142 included the principal,

---

[3] Co-Surety #142 is purportedly signed by Eamonn T. Long, as representative of FIA, and by a representative of Lumbermens; however, the names are not discernible from the signatures. (2d Am. Compl. at Ex. D.)

obligee and job description information, referenced the contract date and penal sum of the amount of the bond, and listed FIA and Lumbermens, by name, with a specific sum of money apportioning the penal sum of the bond at issue. (Id. ¶ 25.) According to Plaintiffs, the same form had been used between the parties and was often prepared by Kemper itself. The parties proportionately shared in losses on any bonds written with such "co-surety" forms. (Id. ¶ 26.) By this agreement, and "[a]s was the course of dealings between the parties," Plaintiffs allege that Lumbermens agreed to share proportionately in all losses, including loss adjustment expenses incurred, and agreed to be liable for losses equal to the proportionate share that $2,000,000 bears to the penalty of the bond, or 28.66%. (Id. ¶¶ 27-30.) The Principal/Contractor on Co-Surety #142 is listed as Valenzuela Engineering, Inc. and the Obligee as the Department of the Army. N/B Renovate Aircraft Maintenance Facility is listed as the Job Description. The name AXA does not appear on Co-Surety #142. (Id. at Ex. D.)

In connection with the Valenzuela Bonds, AXA and/or FIA allegedly sustained net losses, including loss adjustment expenses, in the amount of $356,409.25. (Id. ¶ 41.) Plaintiffs claim that according to Co-Surety #142, AXA and/or FIA are entitled to payment from Lumbermens in the amount of $102,146.87

and that Lumbermens, without justification and in material breach of Plaintiffs' right to indemnification, has refused to remit payment.  (Id. ¶¶ 43-45.)

### 3.  Eaton Bonds

On or about May 27, 1999, AXA, as surety, and non-party Eaton Electric, Inc., as principal, executed a Performance Bond and a Payment Bond in favor of the Dormitory Authority of the State of New York in connection with construction work known as Brooklyn College Library Rehabilitation and Expansion Contract L-4 ("the Eaton Project"). Each bond was in the penal sum of $8,933,000 and were known as Bond No. L04616 ("the Eaton Bonds"). The AXA representative listed on the Eaton Bonds is Patrick J. Lynch as Attorney-in-Fact.  (Id. ¶¶ 21-23 and Ex. C.)

Plaintiffs allege that AXA, by and through its agent FIA, and Lumbermens entered into a written agreement, designated as Co-Surety #146.[4]  (Id. ¶ 31.)  According to Plaintiffs, Co-Surety #146 was also prepared by Kemper Insurance Company, owner of Defendant, Kemper letterhead, and forwarded to FIA, as agent for AXA, "as was the customary procedure employed between the parties."  (Id. ¶ 32.)  And "[a]s was the course of dealings

_____

[4] The copy of Co-Surety #146 only contains a signature by a representative of Lumbermens.  (2d Am. Compl. at Ex. E.)

8

between the parties," Co-Surety #146 included the principal, obligee and job description information, referenced the contract date and penal sum of the amount of the bond, and listed FIA and Lumbermens, by name, with a specific sum of money apportioning the penal sum of the bond at issue. (Id. ¶ 33.) According to Plaintiffs, as with Co-Surety #142, the same form had been used between the parties and was often prepared by Kemper itself. The parties proportionately shared in losses on any bonds written with such "co-surety" forms. (Id. ¶ 34.) By this agreement, and "[a]s was the course of dealings between the parties," Plaintiffs allege that Lumbermens agreed to share proportionately in all losses, including loss adjustment expenses incurred, and agreed to be liable for losses equal to the proportionate share that $3,133,000 bears to the penalty of the bond, or 35.07%. Lumbermens assigned its Bond No. LM-0241585 to Co-Surety #146. (Id. ¶¶ 36-38, 40.) With respect to the Eaton Bonds, Universal Bonding invoiced Colonia "c/o FIA" at FIA's address in Parsippany, New Jersey, on July 28, 1999. The bond number on the invoice is the same bond number listed on Co-Surety #146. (Id. at Ex. F.)

A document identified as Co-Surety Agreement (Revised 7/26/99) Approval #146, which was previously submitted by Plaintiff AXA as the documentation of Co-Surety #146, is signed

by representatives of Lumbermens and FIA.  In that document, FIA is identified as Lead Surety.[5]  (Dreifuss Aff. at Ex. E.)

In connection with the Eaton Bonds, AXA and/or FIA allegedly sustained and paid net losses, including loss adjustment expenses, in the amount of $9,298,770.22.  (Id. ¶ 46.)  According to Plaintiffs, by the terms of Co-Surety #146, AXA and/or FIA are entitled to payment from Lumbermens in the proportionate share of 35.07%, or $3,261,456.76.  Lumbermens has failed and/or refused to pay AXA for its proportionate share of liability under Co-Surety #146 without justification and has therefore materially breached AXA and FIA's right to indemnification from Lumbermens.  (Id. ¶¶ 47-50.)

## B.  Procedural Background

Plaintiff AXA filed a Complaint against Lumbermens for breach of contract and breach of indemnity.  Lumbermens moved to dismiss and Plaintiff AXA filed an Amended Complaint.  Lumbermens

---

[5] **Plaintiffs did not include the Co-Surety Agreement Approval #146 in the Second Amended Complaint, which previously had been attached to Plaintiff AXA's Amended Complaint.  Although Plaintiffs did not include it with their Second Amended Complaint, the Court can take it into consideration when making its determination because it was a document in Plaintiffs' possession and/or it is a document of which they had knowledge.  See Brass v. Am. Film Techs., Ins., 987 F.2d 142, 150 (2d Cir. 1993).**

filed its reply in furtherance of its Motion to Dismiss, stating that Plaintiff's Amended Complaint did not moot its Motion to Dismiss.  On July 13, 2005, the Court dismissed Plaintiff AXA's breach of contract claims with prejudice and granted AXA leave to replead its breach of implied indemnity claims against Defendant.

In the Second Amended Complaint, Plaintiff AXA is joined by Plaintiff FIA.  They have brought six causes of action against Lumbermens based on Co-Surety #142 and Co-Surety #146 (collectively "Co-Sureties"), alleging breach of implied indemnity, reformation of contract and breach of contract.

## II.  DISCUSSION

Lumbermens moves to dismiss the Second Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Lumbermens argues that the Second Amended Complaint represents a mere "tinkering" with the allegations set forth in prior pleadings, that the joinder of FIA is "mere window dressing" and does not cure the infirmities in Plaintiffs' pleadings, and that Plaintiffs' contract claims are barred by the doctrine of res judicata.

The legal standard for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) was set forth in the Court's prior opinion and will not be reiterated here.

11

**A.   Reformation of Contract and Breach of Contract**

Defendant seeks to dismiss Plaintiffs' contract claims, including their reformation claims, on the ground that they are barred by the doctrine of <u>res</u> <u>judicata</u>.  Plaintiffs argue that <u>res</u> <u>judicata</u> does not bar their contract claims because FIA was not a party to the earlier litigation and Lumbermens has failed to argue or establish that FIA was in privity with AXA. Defendant responds that the contract claims are actually brought by AXA, and not FIA, and that even assuming that FIA is deemed to have brought these claims, FIA's interests were adequately protected in the initial proceedings.

### 1.   <u>Res</u> <u>Judicata</u>

"The doctrine of <u>res</u> <u>judicata</u>, or claim preclusion, holds that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" <u>Monahan v. New York City Dep't of Corrs.</u>, 214 F.3d 275, 284-85 (2d Cir. 2000) (quoting <u>(Allen v. McCurry</u>, 449 U.S. 90, 94 (1980)).  "A first judgment will generally have a preclusive effect only where the transaction or connected series of transactions at issue in both suits is the same, that is where the same evidence is needed to support both claims, and where the facts essential to the second

were present in the first." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1463-64 (2d Cir. 1996). The doctrine was established as a means to promote legal economy and certainty. Expert Electric, Inc. v. Levine, 554 F.2d 1227, 1232 (2d Cir.), cert. denied, 434 U.S. 903 (1977).

In order to prove that a claim is precluded under res judicata, a party must demonstrate that (1) the previous action involved an adjudication on the merits, (2) the previous action involved the parties or those in privity with them, and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action. Monahan, 214 F.3d at 284-85. A res judicata defense may be raised on motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) where the basis for the defense is set forth in the complaint or established by public record, see Cameron v. Church, 253 F.Supp. 2d 611, 619 (S.D.N.Y. 2003), or otherwise when all relevant facts are shown by the court's own records, of which the court takes judicial notice. See Day v. Moscow, 955 F.2d 807, 811 (2d Cir. 1992).

It is clear that both the first and third requirements under the res judicata doctrine have been met in this case. The Parties only dispute whether the privity requirement has been satisfied.

The existence of privity between parties "is a functional

inquiry and not merely a static examination of legal status."
Waldman v. Village of Kiryas Joel, 39 F.Supp. 2d 370, 380
(S.D.N.Y. 1999), aff'd 207 F.3d 105 (2d Cir. 2000). "[A] party
will be bound by the previous judgment if his 'interests were
adequately represented by another vested with the authority of
representation.'" Monahan, 214 F.3d at 285 (quoting Alpert's
Newspaper Delivery, Inc. v. The New York Times Co., 876 F.2d 266,
270 (2d Cir. 1989); see also Chase Manhattan Bank, N.A. v.
Celetox Corp., 56 F.3d 343, 346 (2d Cir. 1995).

As Defendant points out, FIA submitted its own affidavit in
support of Plaintiff AXA's Opposition to Defendant's Motion to
Dismiss the previous Complaint in this matter. In addition, the
Second Amended Complaint makes abundantly clear that the
interests of AXA and FIA are very much in line with each other,
if not identical. Throughout the Second Amended Complaint,
Plaintiffs refer to injuries having occurred to "AXA and/or FIA"
and Defendant having breached its obligation to "AXA and/or FIA."
The Court finds that FIA does not have a separate interest in the
litigation from that of AXA and hence, that its interests were
adequately represented in the prior adjudication of Plaintiff
AXA's contract claims.

Accordingly, the Court finds that AXA and FIA are in
privity, and their contract claims are thus barred by the

14

doctrine of <u>res</u> <u>judicata</u>.


2.  Breach of Contract

Even if the claims were not barred by <u>res</u> <u>judicata</u>,

Plaintiffs' breach of contract claims would still fail.  As the

Court stated in its prior opinion,

> From the face of Co-Surety #142 and Co-Surety #146
> . . . , there is nothing indicating any obligation
> of Lumbermens <u>to FIA or AXA</u>.  The documents merely
> allocate portions of the Contract Amount between FIA
> and Lumbermens.  Indeed, nowhere in the Co-Sureties
> is there even a provision that makes <u>AXA, or FIA</u>,
> liable for Lumbermens' share of the surety.  The
> Court cannot glean from the face of the Co-Sureties
> any language of contractual obligation on the part
> of <u>either AXA (or FIA)</u> or Lumbermens upon the non-
> performance by either party of its obligations.  It
> is insufficient for AXA to merely plead breach of
> contract in its Amended Complaint.  Such a claim
> cannot stand where, as here, the language in Co-
> Surety #142 and #146 precludes any breach of contract
> claim by <u>AXA or FIA </u>against Lumbermens.

2005 WL 1649045, at *5 (emphasis added).

In their Second Amended Complaint, Plaintiffs have again

failed to point to any contractual provision in the Co-Sureties

which would indicate contractual obligation on the part of the

signed parties.  The documents submitted in Plaintiff's original

and Amended Complaint are the identical documents at issue in the

Second Amended Complaint.  It is clear that no breach of contract

can be maintained by Plaintiffs based on the Co-Sureties.


15

Therefore, as an alternative basis for dismissal, the Court finds that AXA has failed to state a claim for breach of contract based on either Co-Surety #142 or #146.

### 3. Reformation of Contract

Even if the reformation of contract claims were not barred by <u>res</u> <u>judicata</u>, those claims could not withstand a Rule 12(b)(6) motion.

Under New York law, "reformation can be granted only in two circumstances: where there has been a (1) mutual mistake; or (2) unilateral mistake coupled with fraudulent concealment by the knowing party." <u>Winmar Co., Inc. v. Teachers Ins. and Annuity Assoc. of America</u>, 870 F.Supp. 524, 535 (S.D.N.Y. 1994).

Plaintiffs fail to support their conclusory allegations of mutual mistake or unilateral mistake with factual allegations. Indeed, Plaintiffs' attempt to characterize the Co-Sureties as a result of a mistake by both parties or one party to the Co-Sureties, is in part refuted by the Co-Surety Agreement (Revised 7/26/99) Approval #146. That document clearly states that FIA, not AXA, is the <u>lead</u> <u>surety</u>, thereby reinforcing the interpretation of Co-Surety #146 as an agreement between FIA and Lumbermens. (Dreifuss Aff. at Ex. E.) In addition, Plaintiffs' pleadings fail to support their allegations that the manner in

which the Co-Sureties were drawn up and executed was a result of

a mistake.  Plaintiffs refer to "dozens of co-surety agreements"

where Lumbermens, through its agent Universal Bonding, and AXA,

through its agent FIA, executed those agreements in the name of

AXA.  Taking these factual allegations to be true, as the Court

must, it is incredible that Lumbermens and AXA, who have

allegedly had numerous dealings in which they have entered into

co-surety agreements, would mistakenly enter into a co-surety

agreement whereby Lumbermens, not through Universal Bonding, but

on its own, entered into an agreement with FIA, on the

understanding that FIA was acting as agent to AXA.

Accordingly, the Court finds that Plaintiffs have also

failed to state a claim for reformation of contract for either

Co-Surety #142 or Co-Surety #146.


B.  Breach of Indemnity Claims

Where there is no express agreement creating a right to

indemnification, an implied right of indemnification can be

found.  See Fromer v. Vogel, 50 F.Supp. 2d 227, 240 (S.D.N.Y.

1999) (citing Trustee of Columbia University in the City of New

York v. Mitchell/Giurgola Associates, 109 A.D.2d 449, 451-52 (1st

Dep't 1985).  This right "arises when '[a] person [], in whole or

in part, has discharged a duty which is owed by him but which as

between himself and another should have been discharged by the other, is entitled to indemnity.'" <u>Matter of Poling Transp. Corp.</u>, 784 F.Supp. 1045, 1048 (S.D.N.Y. 1992) (quoting <u>McDermott v. City of New York</u>, 50 N.Y.2d 211, 216-17 (1980); <u>see also</u> <u>New York v. Hickey's Carting, Inc.</u>, 380 F.Supp. 2d 108, 120 (S.D.N.Y. 2005) ("An action for implied indemnity lies where plaintiff and defendants owe a duty to third parties and plaintiff discharges the duty which, as between plaintiff and defendants, should have been discharged by defendants.").

An implied right of indemnification may be based on the special nature of a contractual relationship between parties. <u>People's Democratic Republic of Yemen v. Goodpasture, Inc.</u>, 782 F.2d 346, 351 (2d Cir. 1986). Specifically, an implied right to indemnification may be based on an "implied contract theory" of indemnity, or an "implied in fact" indemnity." <u>Id.</u> "[A] party must show facts demonstrating that there is something 'special' about the contractual relationship that would warrant implying in fact a contract for indemnification." <u>City of New York v. Black & Veatch</u>, No. 95 Civ. 1299, 1997 WL 624985, at *11 (S.D.N.Y. Oct. 6, 1997). "Relationships that support implied indemnification include employer/negligent employee, building owner/independent contractor, and motor vehicle owner/negligent driver." <u>Pro Bono Investments, Inc. v. Gerry</u>, No. 03 Civ. 4347, 2005 WL 2429787, at

*17 (S.D.N.Y. Sept. 30, 2005) (citation omitted).  The plaintiff
bears a heavy burden in establishing an implied agreement to
indemnify, "especially in business relationships where parties
are free to negotiate for express indemnification clauses."
**Black & Veatch**, 1997 WL 624985, at *10.

As the Court noted in its prior opinion, Co-Sureties #142
and #146 do not contain any express agreement for indemnification
and thus, a breach of indemnity claim can only be maintained if
it is based on an implied right of indemnification theory.

In the Court's prior opinion, the Court found that Plaintiff
AXA lacked standing to bring breach of indemnity claims against
Defendant.  **AXA**, 2005 WL 1649045, at *7.  The Court, however,
recognized that it was possible for Plaintiff AXA to allege all
the required elements of an implied indemnity cause of action,
and hence, allowed Plaintiff to replead those claims.

Upon review of the Second Amended Complaint, the Court finds
that Plaintiffs have failed to allege the requisite "special
relationship" between them and Lumbermens that would allow
Plaintiffs to proceed against Defendant on an implied indemnity
theory.  Plaintiffs have set forth, at length, arguments about
the special nature of the relationship between the Plaintiffs;
however, Plaintiffs have not met their heavy burden of
establishing a special relationship between AXA and/or FIA, and

Defendant that was anything beyond the apparent business relationship between them, a business relationship where the Parties were free to negotiate and agree to express indemnification clauses.  The regular "course of dealing," referred to several times in the Second Amended Complaint between Plaintiffs and Defendant, is not sufficient to warrant a determination that the relationship between the Parties was of a special contractual nature where the Court might find a right to implied indemnification.

C.    Leave to Replead

As the Parties are aware, Rule 15(a) of the Federal Rules of Civil Procedure requires that courts freely grant leave to amend "when justice so requires."  Fed. R. Civ. P. 15(a).  "[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead."  Cohen v. Citibank, No. 95 Civ. 4826, 1997 WL 88378, at *2 (S.D.N.Y. Feb. 28, 1997).  Absent a showing of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or the futility of the amendment, a plaintiff should be granted leave to replead. See Protter v. Nathan's Famous Sys., Inc., 904 F.Supp. 101, 111 (E.D.N.Y. 1995) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  If an amendment would be futile, courts can deny leave

to amend. See <u>Oneida Indian Nation of N.Y. v. City of Sherrill</u>, 337 F.3d 139, 168 (2d Cir. 2003) (citing <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)). "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." <u>Id.</u> (citing <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 941 F.2d 119, 123 (2d Cir. 1991)).

Plaintiffs have already had three chances to cure the deficiencies in their pleadings. The Court finds that leave to replead any claims would be futile.

Accordingly, the Court GRANTS Lumbermens' Motion to Dismiss the Complaint.

### III. CONCLUSION

For the foregoing reasons, Defendant Lumbermens' Motion to Dismiss the claims against it is GRANTED. Plaintifs' Second Amended Complaint is DISMISSED with prejudice.

The Clerk of the Court is DIRECTED to close this case and remove it from the docket.

SO ORDERED.

Dated:   New York, New York
         May 25        , 2006

<u>Deborah A. Batts</u>
DEBORAH A. BATTS
United States District Judge

21